IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 23, 2024 Session

## STATE OF TENNESSEE v. SCOTT ALLEN BRIGGS

**Appeal from the Circuit Court for Blount County**
**No. C-25903    David R. Duggan, Judge**

_____

### No. E2022-01463-CCA-R3-CD

_____

The Defendant, Scott Allen Briggs, was convicted by a Blount County Circuit Court jury of rape of a child, a Class A felony, for which he is serving a thirty-five-year sentence as a Range II offender.  *See* T.C.A. §§ 39-13-522 (2018) (subsequently amended) (rape of a child, Range II or higher sentencing requirement).  On appeal, the Defendant contends that: (1) the trial court erred in denying his motions to dismiss due to the State's failure to preserve evidence, (2) the court erred by instructing the jury on flight, (3) the court abused its discretion in three of its evidentiary rulings, and (4) the court erred in sentencing.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and J. ROSS DYER, JJ., joined.

Rick Allen Owens, Maryville, Tennessee, for the appellant, Scott Allen Briggs.

Jonathan Skrmetti, Attorney General and Reporter; Katherine C. Redding, Senior Assistant Attorney General; Ryan K. Desmond, District Attorney General; Ashley Salem and Tyler Parks, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The Defendant's conviction results from his January 16, 2016 sexual assault of a four-year-old boy.  Although the sexual assault was reported on the same day and an investigation began, the Defendant was not charged by warrant until March 23, 2018.[1]

---

[1] The Defendant was later indicted for rape of a child and was also indicted for evading arrest and reckless endangerment related to his arrest on the March 23, 2018 warrant charging him with rape of a child.  The rape of a child charge was severed from the other charges.  The present appeal concerns only the rape of a

Shortly before the Defendant was charged, the victim's clothing and some of the items in the rape kit collected from the victim at the beginning of the investigation were mistakenly destroyed pursuant to departmental policy related to the destruction of evidence for uncharged matters. The Defendant sought to have the charge dismissed based upon the unavailability of this evidence, but the trial court denied his motion.

At the trial, Sandra Sutton, a jail inmate, testified that she was in custody for a probation violation related to a drug conviction and that she was awaiting sentencing on a federal gun charge. She said she had not received any offers to resolve any pending criminal matters in exchange for her testimony in the present case.

Ms. Sutton testified that she met the Defendant on January 15, 2016, the day before the incident which led to the Defendant's charge in the present case. She said she had dated Josh Richardson at the time and that Mr. Richardson was friends with the Defendant and the Defendant's wife, "Kimmy."

Ms. Sutton testified that on January 16, 2016, she took Mr. Richardson to the Defendant's house, went to her second-shift job, and returned to pick up Mr. Richardson after work. She said that she had tried to call Mr. Richardson on her way but that he had not answered. She stated that when she walked on the porch, she "saw people [on a foldout couch inside the house] under the covers laying and someone facing with his back towards me thrusting in the other direction." Ms. Sutton said that she watched through the window for about three to five minutes, that lights and a television were on inside the home, that she was able to see clearly into the home, and that she thought she saw sexual activity. She said she "saw [the Defendant] roll over . . . and a child laying on the other side." She agreed that she said previously that she saw three children on the foldout couch. She said she waited for the Defendant to pull up his pants before making noise to notify the Defendant of her presence. Ms. Sutton said she used her cell phone to call Mr. Richardson as she did this. Ms. Sutton identified photograph exhibits depicting the porch, the front door, the window on the door through which she looked into the home and the foldout couch inside the home.

Ms. Sutton testified that she knocked on the door and that the Defendant opened the door. She said that she asked where Mr. Richardson was, that the Defendant pointed to Mr. Richardson "passed out in the recliner in the corner," and that it appeared the Defendant and Mr. Richardson had been drinking. She did not recall if a second recliner was in the room. She said she did not tell Mr. Richardson what she had seen until she drove away from the home. Ms. Sutton said they returned to the home after about fifteen minutes and located the victim's "father figure," Derek Fuller, who was asleep in the home. She said Mr. Fuller had been asleep in a different room than the one in which the foldout

child trial and conviction.

couch was located. Ms. Sutton stated that she and Mr. Richardson took Mr. Fuller outside the home, told him what she had seen, and instructed him to get his and the victim's belongings in order for Mr. Fuller and the victim to spend the weekend with Mr. Richardson and her.

Ms. Sutton testified that she, Mr. Richardson, Mr. Fuller, and the victim left the home together. She said they went to a restaurant because she wanted to determine "where [the victim] was mentally." She said that after thirty to forty-five minutes, they left the restaurant and went to Blount Memorial Hospital. Ms. Sutton said they were unable to contact the victim's mother immediately but that the victim's mother eventually arrived. She said a police officer at the hospital told them that they needed to take the victim to Children's Hospital, which they did.

Ms. Sutton testified that she went with the victim and the victim's mother to Children's Hospital. She identified a photograph exhibit which she said depicted the victim at Children's Hospital. Ms. Sutton said she stayed at the hospital "[m]ost of the night, into the next morning," leaving after she spoke to a detective. She said a rape kit was collected from the victim. She said the victim and his mother left the hospital together.

Ms. Sutton testified that the victim was about four or five years old at the time but that he "was like on a two-year-old mentality . . . and was very attention deprived." When asked if the victim could have a conversation, she responded, "Not necessarily."

Former Blount County Sheriff's Investigator Jason Shudan testified that he assisted with evidence collection related to the Defendant's case. Mr. Shudan said he collected the rape kit and some clothing from Children's Hospital. Other evidence showed that the clothing had been worn by the victim when he came to the hospital. Mr. Shudan also collected a buccal swab from the Defendant. Mr. Shudan said he delivered the evidence he collected to the sheriff's department's property room. Mr. Shudan acknowledged that he had not collected the bedding from the foldout couch where the sexual assault was reported to have occurred because he did not think collection was necessary.

Blount County Sheriff's Detective David Henderson testified that he responded to Children's Hospital on the morning of January 16, 2016, regarding a child rape allegation. Detective Henderson said he took statements from Nurse Williams, Dr. Craig, the victim's mother, and Mr. Fuller. Detective Henderson said that after taking the statements, he identified the Defendant as the suspect and arranged for the victim to undergo a forensic interview. Detective Henderson said that when the victim arrived that evening at the Child Advocacy Center for the forensic interview, the victim was upset, tearful, afraid, and refused to go into the interview room. Detective Henderson said that due to the victim's lack of cooperation, the interview was cancelled. Detective Henderson said that although

he never heard the victim speak, he was aware that the victim "made a couple of two-word sentences . . . during the investigation."

Detective Henderson testified that he, Department of Children's Service's (DCS) employee Michael Dowsey, Investigator Shudan, and "Deputy Key" went to the Defendant's home. Detective Henderson said they "made contact with" the Defendant and the Defendant's wife. Detective Henderson said Investigator Shudan collected evidence and photographed the home.

Blount County Sheriff's Property and Evidence Officer Henry Vaughn testified that he received evidence related to this case and transported it to the Tennessee Bureau of Investigation (TBI) Crime Laboratory for examination and later returned the evidence to the Blount County evidence storage facility. Officer Vaughn said that, due to his clerical error during a periodic audit of stored evidence, clothing and a "white exam sheet" were inadvertently destroyed. He said he had asked officers about retention or destruction of items of evidence and agreed that the destruction of the items had been an "honest mistake." He said the clothing had already been to the laboratory before their destruction. He said the buccal swabs and the rape kit were tested at the laboratory and had not been destroyed.

Frances Craig, M.D., an expert in pediatric emergency medicine, testified that she was working in the Children's Hospital emergency room on January 16, 2016, and that she examined the victim. She said she collected evidence for a rape kit. She observed a small bruise on the victim's left buttock which appeared to be more than a few hours old. She said it would not be unusual for the victim of anal sexual assaults to have a "normal exam." She said that external injury or trauma from an anal sexual assault often did not occur in the absence of the victim's having actively resisted the assault. She said that a child sexual abuse victim often did not resist a sexual assault perpetrated by a person with whom the victim had become "comfortable over time."

Dr. Craig testified that a woman who was at the hospital with the victim related that the woman had seen "her boyfriend's best friend" having sex with the victim. The woman told Dr. Craig that her boyfriend's best friend was the victm's stepfather. The woman told Dr. Craig that the woman had initially, mistakenly thought the person with whom the victim's stepfather was having sex was an adult woman. The woman told Dr. Craig that the woman and the woman's boyfriend left the home but later returned, at which point the woman saw "the child . . . face down on top of the man," who "quickly pushed the child off and pulled his pants up."

Dr. Craig testified that she did not note signs of developmental delay in the victim. She stated that she typically focused on the examination, that she spoke with the adults in situations such as this, and that "some of those things may have gone unnoticed." She said

that if she had noticed developmental delay, she would have documented it in her notes. She said she had been with the victim for about fifteen minutes.

Blount County Sheriff's Deputy Steven Flanagin testified that he spoke with the Defendant by telephone and advised the Defendant of an outstanding arrest warrant and of the Defendant's need to surrender to the authorities. Deputy Flanagin said the Defendant had did not surrendered the next day and that Deputy Flanagin saw the Defendant traveling in a truck. Deputy Flanagin recognized the Defendant from their prior acquaintance. Deputy Flanagin said that he activated his marked patrol car's emergency equipment and that the Defendant "took off at a high rate of speed." Deputy Flanagin said the Defendant fled for one to three minutes but stopped when the truck ran out of gas.

The victim's father testified that the victim had been four years old in January 2016. The victim's father said that, at the time, he had every-other-weekend visitation of the victim but that he now had custody of the victim. The victim's father said the victim had limited verbal abilities and had been unable to respond to questions in January 2016. The victim's father said the victim "can speak a lot better now [at age ten] than he did when he was four," although the victim's father acknowledged that the victim did not have the communication skills of "normal ten-year-olds." The victim's father agreed that he had not been at the home where the sexual assault occurred, at Children's Hospital, or at the Children's Advocacy Center on January 16, 2016.

TBI Special Agent Forensic Scientist Jennifer Millsaps, an expert in forensic biology, testified that she received a rape kit and clothing items for analysis in this case. She said that upon initial, presumptive testing, the buccal and oral swabs from the victim did not contain evidence of semen, and the victim's anal swabs contained semen but not spermatozoa. Based upon these findings, the saliva swabs and the victim's clothing were not tested pursuant to TBI policy to test samples from inside the body first and work outward, depending on the earlier results.

Agent Millsaps testified that she performed an extraction process, which separated sperm cells from other cells, on the sample from the anal swabs. From this process, she obtained a non-sperm fraction and a sperm fraction. The non-sperm fraction contained a DNA mixture of at least two people and that the DNA profile for the major contributor was consistent with the victim's DNA profile. She said the results were inconclusive as to the identity of the contributor of the minor profile. For the sperm fraction, the DNA profile contained a mixture of at least two people, with the Defendant's profile matching that of the major contributor and the victim's profile matching that of the minor contributor. She said the presence of victim's DNA profile in the sperm fraction could be explained because "some of the . . . DNA from that non-sperm remains with the sperm fraction profile" when the extraction process occurs.

Agent Millsaps testified that she later received samples from which she developed DNA profiles for three male individuals other than the victim and the Defendant. Other evidence showed that these individuals were the Defendant's children. All of these individuals were excluded as DNA contributors to the sample from the anal swabs. Agent Millsaps acknowledged that she knew the identity of the suspected perpetrator when she conducted her analysis.

The victim's mother was called by the defense and testified that she had not been at the Defendant's home on the night of January 15 and early morning of January 16, 2016. She said that, at the time, she had primary custody of the victim and that the victim's father had visitation rights every other weekend. She said the victim was age four at the time and had a speech impediment. She said the victim had been able to answer questions but that his speech would have been difficult to understand. She said he could speak words but was unable to have a conversation.

The victim's mother testified that she arrived at Children's Hospital on January 16, 2016, after the victim had been examined. She said she had taken the victim to another location for a forensic interview and that the victim had refused to go into the interview room alone. She said "they" would not allow her to accompany the victim, who verbalized to the examiner that he did not want to go into the room by himself. She agreed that the victim was "upset" and "crying and throwing a fit."

The victim's mother testified that the victim had spent time at the Defendant's home before January 15 and 16, 2016. She agreed that the victim "wasn't unfamiliar" with the Defendant. She said she, her ex-husband, and the victim previously lived at the Defendant's home.

The Defendant testified that he met the victim's mother around October 2011, when the victim was about six months old, and that he and his fiancée, Kimberly Renfro, babysat the victim "over the course of the years." The Defendant said his stepbrother, Derek Fuller, dated and later married the victim's mother. The Defendant said Mr. Fuller, the victim, and the victim's mother had lived with him and Ms. Renfro intermittently, including one period of almost a year when they stayed in a room in his attic. The Defendant estimated the victim's age at around six months to two years old during the approximate one-year period in which the victim, the victim's mother, and Mr. Fuller lived in the attic. The Defendant said that he and Ms. Renfro babysat the victim several times, including for a period that was as long as "a couple of months." The Defendant said he and Ms. Renfro had three sons together, all of whom lived in the home when the victim, the victim's mother, and Mr. Fuller lived there. The Defendant said his youngest son was two years older than the victim.

The Defendant testified that, on January 15, 2016, Mr. Fuller was living at the Defendant and Ms. Renfro's home for a few weeks following Mr. Fuller's "split" with the victim's mother. The Defendant said that Mr. Fuller asked if the victim could come over to play with the Defendant and Ms. Renfro's children and that he and Ms. Renfro agreed. The Defendant said that he, Ms. Renfro, and their children met one of the victim's mother's family members at a business to pick up the victim.

The Defendant testified that he and his family lived in a three-bedroom house in January 2016. The Defendant said that Mr. Fuller slept in the Defendant's oldest son's bedroom, that the oldest son slept on a foldout couch in the living room, and that the two younger sons shared a bedroom. The Defendant said the children played outside for several hours and then watched movies in the living room, with the victim and two of the Defendant's sons on the foldout couch and the third son in one of the two recliners. The Defendant said Mr. Richardson came to the house around 5:00 or 6:00 p.m. The Defendant said that while the children watched movies, he, Ms. Renfro, Mr. Fuller, and Mr. Richardson played cards at the kitchen table for several hours. The Defendant said that he entered the living room around midnight or 1:00 a.m. and "switched the movies" for the children. The Defendant said the victim and one of his sons were still awake. The Defendant said that Mr. Fuller and Mr. Richardson drank beer, that all of the adults drank about two whiskey shots each, and that Mr. Fuller became ill and went to the bathroom.

The Defendant testified that Mr. Richardson went to the living room and sat in the vacant recliner while the Defendant and Ms. Renfro cleaned the kitchen, ate, and watched a movie on a cell phone. The Defendant said the victim had been on the side of the foldout couch that was closer to the front door. The Defendant said that, around 3:00 a.m., he heard a noise that sounded like someone falling over a baby gate which was being used to confine puppies to the front porch and that he went to investigate. He said he walked into the living room, that he saw someone on the front porch who was using the flashlight function on a cell phone, and that he opened the door. He said that Ms. Sutton was at the front door, that she entered the home and asked where Mr. Richardson was, and that she went to the recliner to wake Mr. Richardson. The Defendant said the victim and one of the Defendant's children were still awake watching a movie. When asked if he had told Detective Henderson that all the children were asleep when Ms. Sutton entered the home, the Defendant said he was "pretty sure" the victim and one of the Defendant's children were awake. The Defendant said Ms. Renfro brought Mr. Richardson's jacket into the living room before Ms. Sutton and Mr. Richardson left through the carport door.

The Defendant testified that he knocked on the bathroom door to wake Mr. Fuller to tell him that Mr. Richardson left with Ms. Sutton. The Defendant said that he went to the kitchen and that Mr. Fuller entered the room and said Mr. Richardson and Ms. Sutton were going to return to the home to take Mr. Fuller to buy cigarettes. The Defendant said Mr. Fuller left the home and returned after about twenty minutes, at which time Mr. Fuller

told the Defendant that Mr. Fuller was going to spend the night with Mr. Richardson and Ms. Sutton. The Defendant said Mr. Fuller left and took the victim with him.

The Defendant testified that police officers and a DCS employee came to his home on January 16, 2016, and asked him to go to the courthouse for questioning about allegations related to the victim. The Defendant said he drove to the courthouse and was interviewed that evening.

The Defendant testified that Deputy Flanagin called him on May 22, 2018, about an outstanding warrant, which the Defendant thought was for a probation violation related to an attempted theft. The Defendant said he had not heard anything about the allegations related to the victim for two years and "thought everything was over." He said Deputy Flanagin said "it was for a theft charge." The Defendant said he told Deputy Flanagin that he wanted to finish an out-of-town job on which he was working at the time and that he needed to take his car and belongings to his mother, after which he would surrender to the authorities. He said that he had known Deputy Flanagin for a long time, that he had worked for Deputy Flanagin at a roofing company, and that his mother was married to Deputy Flanagin's uncle. The Defendant denied that he was involved in a high-speed pursuit when he was arrested. He said he had not seen blue lights until Deputy Flanagin "got behind" him. The Defendant said he had not thought he was "running from what had been alleged" years earlier related to the victim. He said Deputy Flanagin's testimony was false regarding the speed at which the Defendant had traveled.

The Defendant testified that he and the victim were comfortable around each other and that the Defendant knew the victim was able to communicate but did not speak in complete sentences. The Defendant said the victim's communication was "maybe not up to [his children's] level" at the same age.

The Defendant acknowledged that he sat on the "bottom corner" of the foldout sofa "next to the entertainment center" on the night in question. He did not explain when during the evening that this occurred. The Defendant said Ms. Sutton's testimony that he had been "thrusting into" the victim "[m]ust be" false because the Defendant had been in the kitchen with Ms. Renfro at the time. The Defendant denied that he had raped the victim. When asked about the DNA evidence, he said, "[I]t could have been skin cells. He's all over my house. My three kids [have] the same DNA as I do."

After receiving the evidence, the jury found the Defendant guilty of rape of a child. At the conclusion of a sentencing hearing, the trial court imposed a Range II, thirty-five-year sentence. This appeal followed.

# I

## Denial of Motions to Dismiss

The Defendant contends that the trial court erred in denying his motions to dismiss the indictment due to the State's failure to preserve various evidentiary items. He argues that the State failed to preserve the following evidence:

1. The recording of the victim's forensic interview;

2. Officer Wayne Ratledge's body camera recording related to his interactions with Ms. Sutton and her statements to him on January 16, 2016;

and

3. The victim's outer clothing and the sheet used in the collection of the rape kit at Children's Hospital on January 16, 2016.

The State counters that the court did not err because the Defendant was not deprived of a fundamentally fair trial.

The trial court conducted a series of hearings on the motions to dismiss. An employee of the Blount County Children's Advocacy Center testified that she and the forensic team attempted to conduct a forensic interview of the victim on the morning of January 16, 2016, but that the victim "was very out of sorts" and would not cooperate. She had understood that the victim had been awake for a long time, had been at a hospital, and had not eaten. She said that no audiovisual recording was made at this time and that she suggested the victim go home, be allowed to sleep, be fed, and return later to the Children's Advocacy Center. She said the victim came to the center a second time that evening, at which point she activated the recording equipment, made an introductory statement on the recording which contained "demographic information," and attempted without success to have the victim enter the interview room. She said he "just wouldn't have it" and never entered the room or appeared on the recording.

The Child Advocacy Center employee identified a handwritten log of the center's activities on January 16, which showed that the recording had been seven minutes and twenty-two seconds long. She identified an interview summary form, the contents of which were consistent with her testimony regarding the victim's visits to the center on January 16. She said that she had inadvertently deleted recordings from 2016, including the recording from the January 16 attempt to interview the victim. She said law enforcement and a technology company attempted to recover the files without success. She

acknowledged that the center currently had cameras in parts of its facility in addition to the interview room but thought they had not been installed until after 2016.

The Child Advocacy Center employee testified that the victim was interviewed on February 22, 2018, regarding an incident that was unrelated to this case. She said that a recording of this interview existed and that the victim was not asked and did not make any statements about prior sexual abuse or the Defendant.

Blount County Sheriff's Detective David Henderson testified that he was present at the Children's Advocacy Center on January 16, 2016. Detective Henderson said the victim was not interviewed the first time the victim was brought to the center. Detective Henderson said the victim refused to cooperate with the interview attempt later that day and that no interview occurred. Detective Henderson said the victim never made any statements about "what happened," the Defendant, or sexual abuse. Detective Henderson said he heard but did not see the victim. When asked what he heard, he said, "Just . . . basically a small child, refusing, no, no, no, just hearing a kid scared and afraid to go into the room." Detective Henderson said that when the victim was told, "[W]e just want to talk to you about what happened," the victim did not reply.

At the conclusion of this hearing, the trial court found that the witnesses had been credible in their testimony "that there was nothing recorded, that there was no interview, that the child wouldn't participate" and noted the existence of "contemporaneous documents" corroborating the testimony. The court found that the State had a duty to preserve the evidence, that its loss had been negligent but not grossly negligent, and that other significant evidence, including DNA evidence, existed. The court denied the motion to dismiss. The court instructed the State to determine whether additional forensic recovery efforts might be successful. The court also stated that it would conduct an in camera review of the recording of the victim's February 22, 2018 forensic interview in an unrelated case to determine if it contained any evidence which might be relevant to this case.[2]

At a subsequent hearing, one of the prosecutors stated that she had consulted with an outside technology firm and had learned that further forensic recovery efforts related to the attempted forensic interview would not be successful and might result in the destruction of electronic evidence not related to this case.

Regarding the body camera footage, defense counsel stated on the record at one of the hearings that he had learned through discussions with the State that body camera footage had been "deleted through some kind of random timeframe deletion if a crime is not charged within a specific number [sic] of time[.]" Counsel stated that the contents of

---

[2] At the motion for a new trial hearing, defense counsel recalled that the trial court had conducted an in camera review of the 2018 forensic interview and "ruled that it was not relevant."

the deleted footage were unknown. One of the prosecutors explained further, "We're unable to determine if [the camera] was rolling during [a deputy's response to Blount Memorial Hospital] to this event or if it was another event."

At a later hearing, Deputy Ratledge testified that he activated the recording equipment on his patrol car and his "belt mic" before entering Blount Memorial Hospital on January 16, 2017. He said he spoke with Ms. Sutton, Mr. Richardson, and Mr. Fuller outside the victim's presence. He said he completed a written report. He did not know the distance from his patrol car at which the belt mic would "lose connection" with the "system" in the car, but he said that, based upon his review of other recordings, the connection was generally lost when he walked past the nurse's station. He said that when he spoke with the witnesses in this case, he was beyond the nurse's station.

Ms. Sutton testified about her observations when she arrived at the Defendant's home after work on the night of the incident, and her testimony was generally consistent with the testimony she later provided at the trial. In addition, she said that when she spoke to the victim privately after taking him to a restaurant, she asked whether the Defendant had hurt the victim and that the victim had replied, "No, [the Defendant] gives me lovings." She said that after she arrived with the victim at Blount Memorial Hospital, she related her "side of the story" to an unidentified deputy. She did not recall if the deputy made notes during their conversation. She said that after she arrived with the victim at Children's Hospital, she "explained the situation" to the medical professionals, who collected evidence for the rape kit.

Detective Henderson testified that, on July 7, 2016, he received a report from the TBI Laboratory about the presence of semen in evidence sent for analysis. He said he received a second report on February 5, 2018, which stated that the Defendant's DNA had been identified in analysis of the anal swab collected from the victim.

Detective Henderson testified that the sheriff's department employed a property and evidence technician and a standard protocol for periodic inventories of stored evidence. He said "[w]e" periodically received lists of evidence related to specific cases, which they marked to indicate whether items should be retained, "released to family members," or destroyed. He did not know the period of time between the inventories. When asked, "Is it standard procedure for [him] to receive some kind of form or letter when they do those inventories about [his] cases?" he responded, "No." He said that he never learned of or authorized the destruction of evidence related to this case and that he first learned about the missing clothing during trial preparation. He said that on September 13, 2019, he checked to see which evidentiary items were still in the sheriff's department's custody and found a bag containing the victim's underwear inside the rape kit in the evidence locker. He did not know if the DNA swabs were still in the custody of the sheriff's department. He agreed that the victim's clothing was never tested before it was destroyed.

-11-

Detective Henderson testified that the Defendant was not charged until March 23, 2018, and explained that insufficient evidence existed for a charge until he received the DNA results on February 5, 2018. He explained that the delay between his receiving the DNA results and the Defendant's being charged was due to Detective Henderson's investigating a homicide case at the time. He said that until he had the DNA results, he had no evidence of sexual penetration to support a rape of a child charge. He acknowledged that the sexual assault examination had not shown signs of injury. He said Ms. Sutton told him that she had seen a white male "with his bare butt to her back . . . going in a thrusting motion." Detective Henderson said Ms. Sutton stated that the man rolled to his back and masturbated and that she said a child, who was shirtless and with his pants pulled down, was beside the man. Detective Henderson said Ms. Sutton identified the man as the Defendant.

Dr. Craig testified that when she examined the victim at Children's Hospital, she observed a bruise on his buttock but no obvious signs of sexual assault. She said she would "[n]ot necessarily" expect bruising or tears from an anal rape of a four-year-old child. She said it was not unusual for no physical signs of a sexual assault to be observed on examination.

Dr. Craig testified that the sheet used during an examination of a reported victim was preserved as part of the rape kit. She agreed that it might contain hair and bodily fluids that were shed from a victim during the examination.

Janet Williams, R.N., testified that she assisted Dr. Craig with the victim's sexual assault examination. She said that after the examination, she provided the rape kit to hospital security. She said the clothing and the sheet would have been packaged separately from the other evidence collected with the rape kit. A hospital security and safety manager testified about having received the evidence from Nurse Williams and having released it to "Officer Smith."

Blount County Sheriff's Department Technology Director Steven Hackney testified that patrol vehicle dash camera video was downloaded by wireless transfer onto a "server system" when the cars pulled into the justice center's parking lot. He said the recordings remained on the server system for a day or two, until they were "processed in the server." He said a disc backup was also created. He said that "if a case is requested," it would be "preserved for an unlimited amount of time." He further explained that if no case were requested, the recording would be preserved for about two years. He said that after about two years, a list was generated of the recordings which were due for destruction and that the evidence custodian destroyed them. He said the disc containing video recordings from January 16, 2016, were destroyed as part of this routine process. He said two recordings from Deputy Ratledge's patrol car were on the disc that was destroyed. He did not know

further details about the contents of those video recordings and said the sheriff's department did not have body cameras on January 16, 2016.

Former sheriff's department crime scene investigator Jason Shudan testified that he collected the rape kit and some clothing from Children's Hospital on January 16, 2016, around 10:00 a.m. He said that he would have taken the evidence to the property and evidence room at the sheriff's department office and that the sheriff's department records showed the evidence custodian took possession of the evidence on January 21, 2016. He said that on June 26, 2016, a TBI forensic scientist informed him by telephone that she had identified semen on one of the swabs from the rape kit. He said that at this point, the Defendant's buccal swab had not been sent to the TBI laboratory but that it was sent to the laboratory in November 2016. He explained the procedures he followed to ensure that the Defendant's buccal swab was not cross-contaminated with other evidence. He said that he left his employment with the Blount County Sheriff's Department in May 2017 and that he did not authorize the destruction of evidence in this case before his departure. To his knowledge, evidence related to this case was not destroyed during his employment at the sheriff's department.

Blount County Sheriff's Deputy Hank Vaughn testified that evidence stored in the evidence room was reviewed periodically. He said that four reviews were conducted each year to determine whether evidence should be destroyed and that evidence which was one and one-half to two years old was reviewed for possible destruction. He said the clothing collected as evidence in this case was destroyed on March 28, 2018. Deputy Vaughn said that after checking with Detective Henderson about whether the clothing was eligible for destruction or should be retained, Deputy Vaughn made a clerical error and marked the clothing and the sheet for destruction. He said that error was his and that Detective Henderson never signed any document authorizing destruction. He said he would have completed the review and paperwork months earlier, in December 2017 or January 2018. He said the items still retained as evidence were: the "sex kit," the victim's DNA swab, and the DNA swab of "three other children." He explained that the items which were not destroyed were stored in a different location in the evidence room than the clothing and sheet.

Deputy Vaughn testified that he was not notified when the TBI laboratory had items for pickup but that he picked up any items that were ready when he dropped off new items for testing. He said he periodically went into the TBI's computer system, printed reports, and provided the reports to the appropriate officer. He said printing a report did not "cue" him to retain a given evidentiary item because the computer systems were not integrated.

Deputy Vaughn testified that the discs created to store recordings from body and dash cameras were not stored in the evidence room. He said the "person in charge of the computer tech unit" periodically brought him discs to be destroyed.

-13-

TBI Agent Jennifer Millsaps testified about the testing she performed on the evidence in this case. Her testimony was consistent with the testimony she later gave at the trial. She said that after she identified semen on the victim's anal swab, she had not performed any testing on the other items in the rape kit because this item contained evidence that "was the most internal." She said, "[I]n most cases, we would stop at that point." She said she later identified the Defendant as the major contributor to a mixture of DNA present on the sperm fraction from the victim's anal swab.

At the conclusion of the final hearing, the trial court denied the motions to dismiss the case based upon the unavailable evidence.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. *See Johnson v. State*, 38 S.W.3d 52, 55 (Tenn. 2001). As a result, the State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to his guilt, or lack thereof, or to the potential punishment faced by a defendant. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963).

Our supreme court has held that the State has a duty to preserve discoverable evidence when the evidence

> might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*State v. Ferguson*, 2 S.W.3d 912, 917 (Tenn. 2014) (quoting *California v. Trombetta*, 467 U.S. 479, 488-89 (1984)); *see* Tenn. R. Crim. P. 16 (discoverable evidence); *see also State v. Merriman*, 410 S.W.3d 779, 785 (Tenn. 2013). The supreme court has said that the proper inquiry involves, first, determination of whether the State had a duty to preserve the evidence. *Ferguson*, 2 S.W.3d at 917. This duty to preserve applies to "potentially exculpatory" evidence. *Merriman*, 410 S.W.3d at 793 (citing *Ferguson*, 2 S.W.3d at 917). If the State failed to fulfill the duty, three factors must be considered:

1. The degree of negligence involved;

2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

3. The sufficiency of the other evidence used at trial to support the conviction.

*Id.* (applying factors detailed in *Ferguson*, 2 S.W.3d at 917). The supreme court has said that in evaluating these factors:

> [T]he central objective is to protect the defendant's right to a fundamentally fair trial. If, after considering all the factors, the trial judge concludes that a trial without the missing evidence would not be fundamentally fair, then the trial court may dismiss the charges. Dismissal is, however, but one of the trial judge's options. The trial judge may craft such orders as may be appropriate to protect the defendant's fair trial rights. As an example, the trial judge may determine, under the facts and circumstances of the case, that the defendant's rights would best be protected by a jury instruction.

*Ferguson*, 2 S.W.3d at 917. A trial court's application of the *Ferguson* factors involves a constitutional issue, and our supreme court has concluded that the proper standard of review on appeal concerning the fundamental fairness of a trial is de novo. *Merriman*, 410 S.W.3d at 791.

Regarding the unavailable recording of the attempt to conduct a forensic interview of the victim, the trial court found that the State should have preserved the recording but failed to do so. The court did not make findings regarding the degree of negligence. The court noted that, based upon the evidence presented, the victim never entered the interview room. The court found, "[E]ven if the video recording was made available, it would show nothing."

Regarding Officer Wayne Ratledge's body camera recording related to his interactions with the victim's mother and her statements to him on January 16, 2016, the court found that the State had been negligent but did not address the degree of negligence. The court found that the video component of the recording would have showed nothing once Officer Ratledge left his patrol car. As to the audio component, the court credited Officer Ratledge's testimony that the recording equipment would not have captured relevant evidence once Officer Ratledge entered the hospital. The court noted that the defense retained the opportunity to cross-examine Officer Ratledge at the trial. The court noted that the forensic interviewer could testify that the victim would not enter the interview room and that no statement was obtained. The court noted the existence of other inculpatory evidence, which was not related to the unavailable recording, and concluded that the Defendant could receive a fair trial in the absence of the missing evidence.

Regarding the victim's clothing and the sheet used during the collection of the rape kit evidence, the trial court stated that this was "the biggest issue." The court noted that if the evidence had been preserved, it would be available for testing. The court found that "strongest evidence" consisted of the DNA evidence of semen containing the Defendant's DNA on the swab from the victim's anus. The court noted, as well, the existence of eyewitness testimony of the incident, although the court noted that some aspects of the testimony were inconsistent. The court found that other evidence existed which, if credited by the jury, would be sufficient to support a conviction.

The court stated that the Defendant would have the opportunity to cross-examine the State's witnesses regarding the failure to preserve evidence and to cross-examine the eyewitness about inconsistencies in her account of the incident. The court concluded, "I cannot find that the Defendant cannot receive a fair trial in light of the State's failure to preserve or destroy [sic] this evidence."[3]

In its findings, the trial court did not mention the jury instruction outlined in *Ferguson* as a potential remedy. *See Ferguson*, 2 S.W.3d at 917. The record does not contain the jury instructions, and the Defendant did not raise an issue in the motion for a new trial regarding a *Ferguson* instruction. From the record before us, this court cannot know whether the instruction was given.

We begin with the observation that none of the audiovisual evidence which was not retained appears to have had significant exculpatory value. The trial court credited the State's witnesses, who provided testimony that the patrol car recording equipment would not have captured audio after Officer Ratledge entered the hospital and that the victim refused to enter the interview room for a forensic interview. With respect to the victim's clothing and the sheet used during the collection of evidence for the rape kit, the exculpatory value is unknown. Nevertheless, we conclude that all the unavailable evidence possessed potential exculpatory value. *See id.*; *see also Merriman*, 410 S.W.3d at 793.

Turning to the *Ferguson* factors, the record supports the trial court's determination that the State was negligent in its failure to preserve each of the evidentiary items. The State's witnesses explained that the items were destroyed through inadvertence and, in the case of the clothing and sheet, the evidence custodian's inattention to detail in noting whether the evidence was to be retained or destroyed. We view the State's failures as ordinary negligence. *See Ferguson*, 2 S.W.3d at 917. Regarding the significance of the evidence in view of the other available evidence, we assign little weight to the audiovisual evidence in view of the unlikelihood that the unavailable recordings contained probative,

---

[3] The trial court granted the Defendant's motion for an interlocutory appeal. This court denied the application. *See State v. Scott Allen Briggs*, No. E2019-01947-CCA-R9-CD (Tenn. Crim. App. Jan. 3, 2020) (order denying application for interlocutory appeal pursuant to T.R.A.P. 9).

exculpatory evidence, as contrasted with the probative value of the eyewitness testimony and the DNA evidence. As the trial court noted, the failure to preserve the clothing and sheet is a more difficult question. This evidence had not been analyzed, and its evidentiary value remains unknown. We note that other evidence in the rape kit – the victim's underwear and the victim's oral and anal swabs – were not destroyed and, theoretically, would be available for defense testing. Given the existence of eyewitness testimony and DNA evidence, both of which have high probative value, the evidentiary significance of the destroyed evidence is limited, at best. *See id.* Finally, we consider the sufficiency of the evidence to support the conviction. The trial court considered this question prospectively when it conducted pretrial hearings on the issue, but it ultimately approved the jury's verdict in its capacity as thirteenth juror. *See* Tenn. R. Crim. P. 33(d). We likewise view the other evidence of the Defendant's guilt to be sufficient to support the conviction. Again, the State offered eyewitness testimony and DNA evidence, both of which inculpated the Defendant. The evidence offered at the trial did not suggest an alternative perpetrator or eyewitness fabrication. *See Ferguson*, 2 S.W.3d at 917. Upon de novo review, we conclude that the Defendant was not deprived of a fundamentally fair trial due to the unavailable evidence. *See Merriman*, 410 S.W.3d at 791.

As part of his argument on this issue, the Defendant contends that he "has been effectively denied any possibility of Post Conviction DNA analysis" by the unavailability of this evidence and that he "has been forever barred from proving his actual innocence" of the offense. The case before us does not involve post-conviction DNA analysis. To the extent that the Defendant contends that he is foreclosed, due to the State's failure to preserve evidence, from seeking post-conviction DNA analysis at some future date, his claim is not yet ripe for consideration, aside from our evaluation of the fundamental fairness of the conviction proceedings. *See Ferguson*, 2 S.W.3d at 917. As an aside, we note that although the victim's clothing and the sheet are no longer available, the victim's underwear and oral and anal swabs remain in the rape kit, should the Defendant choose to pursue post-conviction DNA testing in the future.

The Defendant also argues that his counsel could not provide effective assistance without having the ability to review the recordings, and that, therefore, the Defendant was denied due process in the conviction proceedings. *See Strickland v. Washington*, 466 U.S. 668 (1984). We decline to address this argument, which is raised for the first time on appeal, as a free-standing ineffective assistance of counsel claim, rather than as an aside in the Defendant's *Ferguson* argument. *See, e.g.*, *Thompson v. State*, 958 S.W.2d 156, 161 (Tenn. Crim. App. 1997) ("raising the issue of ineffective assistance on direct appeal is a 'practice fraught with peril.'") (*quoting State v. Jimmy L. Sluder*, 1990 WL 26552, at *7, No. 1236 (Tenn. Crim. App. Mar. 14, 1990), *perm. app. denied* (Tenn. July 16, 1990)). Again, the *Ferguson* analysis is the appropriate vehicle for evaluating whether the Defendant could, and did, receive a fundamentally fair trial.

The Defendant argues, as well, that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963) in failing to disclose the unavailable evidence. Once more, *Ferguson* provides the proper analysis for determining whether a defendant's right to a fair trial as a component of due process has been ensured when the State has failed to disclose evidence due to its unavailability. *See Ferguson*, 2 S.W.3d at 915 (discussing *Brady*).

The Defendant is not entitled to relief on this basis.

## II

### Flight Instruction

The Defendant contends that the trial court erred in giving a flight instruction, which he argues the evidence did not support. The State counters that the Defendant waived this claim and that, in any event, the court did not err. We conclude that the issue is waived.

The trial court conducted a hearing to determine whether a flight instruction was appropriate. *See generally* 7 T.P.I—Crim. 42.18 (flight). At the hearing, Deputy Flanagin testified about his having spoken to Detective Henderson the day before the arrest warrant was issued in this case. Deputy Flanagin said Detective Henderson told him that an arrest warrant was going to be issued. Deputy Flanagin said that he spoke with the Defendant by telephone the day the warrant was issued, advised the Defendant of the warrant, and urged the Defendant to surrender voluntarily. Deputy Flanagin said the Defendant was arrested two days later after a brief vehicular pursuit, which ended when the Defendant's truck ran out of gas. Deputy Flanagin said that the truck the Defendant drove at the time of the arrest had a temporary license plate mounted on its outside, that the temporary plate was for a different vehicle, and that the license plate issued for the vehicle the Defendant had driven was found inside the truck. After receiving this proof, the trial court found that the flight instruction was appropriate.

As we noted in Section I above, the jury instructions are not included in the record. Without a record which reflects that the flight instruction was given at the trial and the contents of any such instruction, we are precluded from review. *See State v. Ballard*, 855 S.W.2d 557, 560-61 (Tenn. 1993) (holding that an appellate court is precluded from considering issues for which the appellant has failed to ensure that the record "conveys a fair, accurate, and complete account of what transpired with respect to the issues forming the basis of the appeal"). Consideration of the issue is waived. *See State v. Miller*, 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987) ("When the record is incomplete, or does not contain the proceedings relevant to an issue, this Court is precluded from considering the issue.").

## III

## Evidentiary Rulings

The Defendant contends that the trial court abused its discretion in two evidentiary rulings: (1) allowing the victim's father to testify about the victim's communication abilities, and (2) excluding evidence of the victim's subsequent alleged sexual assault. The State argues that the court did not abuse its discretion. The Defendant also argues, for the first time in his reply brief, that the court abused its discretion in allowing Deputy Flanagin to testify "regarding the Defendant's evading arrest on March 25, 2018." We conclude that the Defendant is not entitled to relief on any of these issues.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Questions regarding the admissibility and relevance of evidence generally lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

A trial court abuses its discretion when it applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006). Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

### A. The Victim's Father's Testimony

The Defendant argues that the victim's father's testimony should have been excluded pursuant to Tennessee Rule of Evidence 602, which provides, in pertinent part, "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness's own testimony." The Defendant points to the evidence which showed the victim's father was not present on the night of the crime, and he argues that the victim's father "was not present in the alleged minor victim's life until several months after the alleged incident." He argues, as well, that the evidence was irrelevant and misleading. *See* Tenn. R. Evid. 401 to 403.

The victim's father testified that, at the time of the offense, he had every-other-weekend visitation of the then-four-year-old victim. He explained the victim's limited verbal abilities and inability to respond to questions at the time of the incident and said the victim's communication skills had improved by the time of the trial but were still not on par with the victim's ten-year-old peers. Other witnesses' testimony corroborated the victim's father's testimony about the victim's limited communication skills at the time of the offense.

When the trial court considered the issue, the State argued that the evidence was relevant to show the Defendant's "motive to pick this particular victim to commit this act" and "to explain why the child is not testifying in this trial." The court found that "a parent is certainly competent to testify as to a child's age and [at] the time of the offense . . . and as to the child's inability to effectively communicate at the time of the offense." The court expressed reservations about admitting the victim's father's testimony to explain why the victim was not a trial witness and said it would "cross that bridge as we come to it." The court said the defense could "raise another objection at the time." The State did not ask the victim's father about why the victim had not been called as a trial witness, nor did the State address the issue in its closing arguments.

The evidence of the victim's impaired communication skills was probative and relevant to explain the victim's failure to participate in a forensic interview. *See* Tenn. R. Evid. 401, 402. The victim's father explained his basis of knowledge relative to the victim's communication abilities at the time of the offense. *See* Tenn. R. Evid. 602.

The Defendant generally asserts that the evidence should have been excluded pursuant to Tennessee Rule of Evidence 403, but he has not stated a specific basis for exclusion or cited authority to support exclusion pursuant to the rule. The Defendant argued in the trial court that the evidence was "misleading." We fail to understand how the relevant evidence of the victim's limited communication skills would mislead the jury, particularly in view of other witnesses' testimony about the victim's communication difficulties at the time of the offense. Therefore, the Defendant has failed to show that the danger of the evidence misleading the jury substantially outweighs its probative value.

In reaching this conclusion, we have considered the Defendant's argument, raised for the first time in his reply brief, that he did not have access to the victim's medical records until the State introduced the records at the sentencing hearing. Without citing authority to support his claim, he argues that he should have had access to these records in order to cross-examine the victim's father about the victim's communication abilities. This issue was not raised in the motion for a new trial. It is waived. *See* T.R.A.P. 3(e). In addition, the Defendant has not cited to any specific portions of the victim's medical records which he contends would have been relevant and probative to cross-examination

of the victim's father. *See id.* at 27(a)(7)(A). We decline to speculate in this regard. The issue is waived on this basis, as well. *See* Tenn. Ct. Crim. App. R. 10(b).

The trial court did not abuse its discretion in permitting the victim's father to testify about the victim's communication abilities at the time of the crime.

### B. The Victim's Subsequent Alleged Sexual Assault

The Defendant argues that the trial court erred in excluding evidence of the victim's alleged 2018 sexual assault on a school bus and the attendant forensic interview. The Defendant cites Tennessee Rule of Evidence 412 in his brief, but he has provided no explanation of how the evidence is admissible pursuant to this rule. Rule 412 is generally a rule of exclusion, subject to certain exceptions for specific instances of conduct. *See generally* Tenn. R. Evid. 412. The Defendant argues generally that he should have been allowed to show that the victim "willingly participated in a subsequent forensic interview" related to the 2018 incident. The State argues that the Defendant has waived this issue by failing to provide an appellate record which is adequate for review of the issue.

The record reflects that the Defendant sought pretrial access to the victim's forensic interview for the alleged 2018 incident. The trial court conducted an in camera review and determined that the records of the forensic interview were not relevant. Those records are not preserved under seal in the appellate record for this court to review to determine if error exists in the trial court's ruling. Consideration of the issue is waived. *See* T.R.A.P. 24(b); *Ballard*, 855 S.W.2d at 560-61; *State v. Miller*, 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987) ("When the record is incomplete, or does not contain the proceedings relevant to an issue, this Court is precluded from considering the issue.").

### C. Evidence of Flight

The Defendant raised an issue for the first time in his reply brief regarding Officer Flanagin's testimony about the Defendant's actions when Officer Flanagin informed the Defendant of the arrest warrant. The Defendant has failed to identify an evidentiary basis for exclusion of this evidence and has failed to cite any decisional authority to support his cursory argument. He also did not raise this issue in the motion for a new trial as an allegation of error in the exclusion of evidence or in the failure to disclose evidence. This issue is waived. *See* T.R.A.P. 3(e), 36(b); Tenn. Ct. Crim. App. R. 10(b).

# IV

## Sentencing

Finally, we turn to the Defendant's contention that the trial court erred in sentencing him to serve thirty-five years as a Range II offender.  He argues that the court erred in applying sentencing enhancement factor (1), related to his prior criminal history.  The State responds that the court did not abuse its discretion.  We agree with the State.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'"  *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012).  A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, the potential for rehabilitation or treatment, and the result of the validated risk and needs assessment.  T.C.A. §§ 40-35-103 (2019), -210 (2019); *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2019).

Likewise, a trial court's application of enhancement and mitigating factors are reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act."  *Bise*, 380 S.W.3d at 707.  "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005."  *Id*. at 706.  "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal.  *Id*.

The Defendant faced a sentence of twenty-five to forty years for rape of a child, a Class A felony.  *See* T.C.A. §§ 39-13-522(b)(1) (Class A felony), (2)(A) (offender must be classified as a Range II offender unless qualified as a Range III offender); 40-35-112(B)(1) (Range II sentencing for Class A felony).

At the sentencing hearing, the parties did not offer witness testimony.  The State introduced a certified copy of the Defendant's prior convictions, the presentence report, and a victim impact statement authored by the victim's father.  The Defendant's prior record included convictions for the following offenses:  ten counts related to driving

without a valid license, misdemeanor attempted theft, possession of drug paraphernalia, and two counts of contempt of court. He also had been found to be in violation of the terms of probation on four occasions. The presentence report reflected that the thirty-five-year-old Defendant had an eighth-grade education and had been employed as a roofer. He had three minor children. The risk and needs assessment rated the Defendant's "risk level" as "moderate." In the victim impact statement, the victim's father said that the victim had difficulty using the bathroom "[w]hen we first got [the victim] in 2018," that the victim had nightmares, that the victim had anger and behavioral issues related to the offense, and that the victim's grandmother had to quit work in order to help care for the victim. Voluminous records from the victim's treatment at Cherokee Health Systems were received as an exhibit.

The trial court noted its consideration of the relevant principles of sentencing, the evidence submitted, and the other statutory factors it was required to consider. Regarding enhancement factors, the court found that the Defendant had a history of criminal convictions or behavior, noting the Defendant's numerous prior convictions spanning years of his adult life. *See id*. § 40-35-114(1) (Supp. 2015) (subsequently amended). The court also found that the Defendant abused a position of private trust that significantly facilitated the commission of the offense. *See id.* at (14). The court found, as well, that the offense was committed against a particularly vulnerable victim, noting the victim's age and disabilities. *See id.* at (4). The court found that no mitigating factors applied. *See id.* § 40-35-113 (2018) (subsequently amended). Weighing the enhancement factors, the court found that a sentence of thirty-five years was appropriate.

The Defendant argues that the court should have imposed a minimum, twenty-five-year sentence. He notes that his criminal history consisted entirely of misdemeanor offenses, most of which were "driving infractions." He has cited no authority or otherwise explained why enhancement factor (1) should not apply.

The record supports the trial court's application of enhancement factor (1). The Defendant had a lengthy history of misdemeanor convictions. The record supports the court's application of the additional enhancement factors it found. The court engaged in a thoughtful and thorough analysis of the facts of the case and the relevant sentencing considerations. The Defendant has not shown that the trial court abused its discretion in imposing a thirty-five-year sentence. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE